UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

KEVIN ROOT, a Washington resident,

Plaintiff

vs.

PROMPTPATH.AI, INC., a Delaware corporation, MAXWELL STECKLER and BETSY STECKLER, California residents, and the STECKLER COMMUNITY ESTATE, and MALCOLM THORNE, a Wisconsin resident,

Defendants.

No.

**COMPLAINT**

Plaintiff, Kevin Root, by and through the undersigned attorneys, alleges as follows:

## I.    PARTIES

1.    Plaintiff, Kevin Root, is a Washington resident.

2.    Defendant PromptPath.AI, Inc., is a Delaware corporation that operates virtually and resides in California.

Complaint
Page 1 of 30

3. At all relevant times, Defendant PromptPath.AI, Inc. (herein "PromptPath.AI" or "the Company"), conducted business in the State of Washington and in the Western District of Washington.

4. Defendants Maxwell Steckler, Betsy Steckler, and the Steckler Community Estate reside in and are citizens of California.

5. Defendant Malcolm Thorne resides in and is a citizen of Wisconsin.

## II. JURISDICTION AND VENUE

6. The matter in controversy exceeds $75,000.00, exclusive of interest and costs.

7. There is complete diversity of citizenship because this dispute is between citizens and residents of different states.

8. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1).

9. A substantial part of the events or omissions giving rise to the claims at issue in this matter occurred in the Western District of Washington; accordingly, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## III. FACTUAL ALLEGATIONS

### A. Founding and Growth of PromptPath.AI

10. Kevin Root is the catalyst behind the artificial intelligence business that became PromptPath.AI.

11. PromptPath.AI's artificial intelligence product is the automotive industry's first Customer Experience Platform designed to elevate interactions between dealership employees and customers by enhancing real conversations. The artificial intelligence product is designed to help employees provide fast, accurate responses, to build stronger relationships, and to grow their skills, leading to higher

Complaint
Page 2 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

customer satisfaction, greater employee engagement, more referrals, and smoother dealership experiences for everyone.

12. On or about June 4, 2023, PromptPath.AI was formed as a Delaware corporation.

13. Kevin Root is a co-founder, shareholder, and former executive employee of PromptPath.AI.

14. June 9, 2023, was the first day of Kevin Root's employment with PromptPath.AI.

15. Kevin Root and Maxwell Steckler each lent $125,000 to bootstrap the Company.

16. By June 9, 2023, Kevin Root had lent $125,000.00 to the Company.

17. $125,000.00 is a liquidated sum.

18. Maxwell Steckler is also a co-founder and an executive employee of PromptPath.AI.

19. At all relevant times, Maxwell Steckler was an officer and director of PromptPath.AI.

20. At all relevant times, Malcolm Thorne was an officer, director and executive employee of PromptPath.AI.

21. At all relevant times, Kevin Root was 64 years of age.

22. Maxwell Steckler knew that Kevin Root was 64 years of age when Maxwell Steckler, acting in concert with Malcolm Thorne, terminated Kevin Root's employment with PrompPath.AI.

23. Malcolm Thorne knew that Kevin Root was 64 years of age at the time of the events at issue in this lawsuit.

Complaint
Page 3 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

24. Maxwell Steckler is roughly 10 years younger than Kevin Root.

25. Malcolm Thorne is roughly 10 years younger than Kevin Root.

26. Kevin Root and Maxwell Steckler had worked together previously, and the Steckler and Root families have been business associates and family friends for over 20 years.

27. When they co-founded PromptPath.AI, Kevin Root and Maxwell Steckler agreed as personal commitments to each other that their plan was to build the Company and sell it to "top off their tanks with $2 to $3 million," meaning that Kevin Root and Maxwell Steckler would each be employees and work for the Company until an exit so they could both "top off" their retirement savings with $2 to $3 million realized from the sale of the Company. Kevin Root and Maxwell intended this commitment to mean that they would be employed by PromptPath.AI until each achieved this goal. Maxwell Steckler would later renege on this commitment by terminating Kevin Root with Malcolm Thorne.

28. Within the first few months of the formation of PromptPath.AI, Maxwell Steckler was in contact with Malcolm Thorne about the PromptPath.AI business concept. Malcolm Thorne expressed interest, initially as an informal sounding board.

29. On November 28, 2023, Kevin Root purchased 4,473,684 shares of PrompthPath.AI shares at a purchase price of $0.0001 per share under a Stock Purchase Agreement.

30. A true and correct copy of the Stock Purchase Agreement is attached as Exhibit 1 to this Complaint.

31. Section 2(a) of the Stock Purchase Agreement states, in relevant part:

Complaint
Page 4 of 30

Until they vest in accordance with Subsection (b) below, the Purchased Shares shall be Restricted Shares and shall be subject to the Company's Right of Repurchase. The Company, however, may decline to exercise its Right of Repurchase or may exercise its Right of Repurchase only with respect to a portion of the Restricted Shares.

32.    In early 2024, Malcolm Thorne proposed that Kevin Root and Maxwell Steckler agree to make him "Executive Chairman" of the board of directors and devote 50% of his available time to PromptPath.AI. Additionally, Malcolm Thorne would lend $62,500.00 to the Company and invest $1 million in it.

33.    If Malcolm Thorne was made Executive Chairman of the board, and if Malcolm Thorne and Maxwell Steckler voted together, they could control board decisions. Likewise, If Malcolm Thorne was made Executive Chairman of the board, and if Malcolm Thorne and Kevin Root voted together, they could control board decisions.

34.    Maxwell Steckler and Kevin Root later agreed to stick together on board decisions to prohibit Malcolm Thorne from making decisions that they would not agree with and that would negatively impact their long friendship. Maxwell Steckler would later breach this agreement.

35.    Kevin Root was extremely hesitant to bring Malcolm Thorne on the board as Executive Chairman. For several months, Maxwell Steckler kept pushing for this to happen.

36.    During the discussions regarding Malcolm Thorne's joining the board as Executive Chairman, Malcolm Thorne attempted to justify his stock compensation requests by explaining to Kevin Root and Maxwell Steckler the negative impact of dilution on his personal PromptPath.AI stock allocation proposal, and his desire to

Complaint
Page 5 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

maintain certain levels of stock ownership "post-dilution" to protect the value of his personal holdings.

37. Malcolm Thorne sent Kevin Root and Maxwell Steckler emails and spreadsheets in which he projected certain investor rounds scenarios illustrating where his personal PromptPath.AI stock allocation would be diluted with proposed post-dilution targets that he did not want to fall below.

38. During the period of time that Kevin Root and Maxwell Steckler were debating having Malcolm Thorne join PromptPath.AI's board as Executive Chairman, on more than one occasion Maxwell Steckler made a personal commitment and promised Kevin Root that he would not let Malcolm Thorne come between them and their long friendship. Kevin Root relied on this personal commitment and promise when he later agreed with Maxwell Steckler to allow Malcolm Thorne to join the board. Maxwell Steckler would later breach this personal commitment and promise by siding with Malcolm Thorne on the decision to terminate Kevin Root's employment.

39. During the period of time that Kevin Root and Maxwell Steckler were discussing and debating having Malcolm Thorne join PromptPath.AI's board, Kevin Root and his spouse traveled to California to visit the Stecklers. The topic of Malcolm Thorne joining PromptPath.AI's board was front and center all weekend. Kevin Root expressed his deep concern to Maxwell Steckler and his spouse, Betsy Steckler, that adding a third person like Malcolm Thorne to the management team could create serious tension in their long friendship. Maxwell Steckler reiterated his promise that he would not let Malcolm Thorne come between their friendship. At one point during this weekend, Betsy Steckler assured Kevin Root's spouse, Carol Root, that Maxwell

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

Steckler "would never let Malcolm [Thorne] come between them and their friendship."

40.    In May of 2024 Kevin Root agreed with Maxwell Steckler to allow Malcolm Thorne to join the PromptPath.AI board of directors as Executive Chairman.

41.    In 2025, roughly one year after Malcolm Thorne joined the board, he approached Kevin Root and Maxwell Steckler and suggested that he (Malcolm Thorne) take over the role of CEO from Maxwell Steckler. Kevin Root was hesitant to agree to this proposal. In these discussions, Malcolm Thorne, Kevin Root, and Maxwell Steckler had a series of difficult, uncomfortable, and ultimately contentious conversations and negotiations about the compensation package that Malcolm Thorne was seeking.

42.    During the discussions over Malcolm Thorne being named the CEO, Malcolm Thorne again attempted to justify his stock requests by explaining to Kevin Root and Maxwell Steckler the negative impact of dilution on his personal PromptPath.AI stock allocation and his desire to maintain certain levels of stock ownership "post-dilution" to protect the value of his personal holdings.

43.    Malcolm Thorne once again sent Kevin Root and Maxwell Steckler emails in which he projected certain investor rounds scenarios illustrating how his personal PromptPath.AI stock allocation would be diluted that stated proposed post-dilution targets that he did not want to fall below.

44.    As they were discussing appointing Malcolm Thorne as the CEO of PromptPath.AI, Maxwell Steckler repeatedly made personal commitments and promises to Kevin Root that Malcolm Thorne "cannot take control of this, together we have the controlling interest," meaning that Maxwell Steckler made a personal

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

commitment and promise to vote with Kevin Root to control the affairs of the Company and not allow Malcolm Thorne to divide them. Kevin Root relied on this personal commitment and promise when he agreed with to name Malcolm Thorne the CEO of PromptPath.AI. Maxwell Steclker would later renege on his personal commitment and promise by siding with Malcolm Thorne and terminating Kevin Root's employment.

45. In April of 2025, following a contentious discussion with Malcolm Thorne regarding his compensation package that occurred on the same day Kevin Root and Maxwell Steckler agreed to name Malcolm Thorne as the CEO, Maxwell Steckler, Betsy Steckler, Kevin Root, and Carol Root (Kevin Root's spouse) held a video conference. During this video conference Maxwell Steckler reaffirmed to Kevin Root and his spouse his personal commitment and promise that, even with Malcolm Thorne appointed as CEO, "he [Malcolm Thorne] cannot take control of this; together, we hold the controlling interest." Maxwell Steckler intended his statement to mean that he and Kevin Root would hold the controlling interest for the foreseeable future. Kevin Root relied on Maxwell Steckler's promises on this issue.

**B.     The Option Pool Concerns Due the Certainty of Founder Dilution**

46. The PromptPath.AI executives commonly used the phrase "option pool" and "stock options" to refer to the shares of PromptPath.AI stock they purchased under a Stock Purchase Agreement and the shares allocated for compensating employees.

47. Creating or increasing the option pool for a startup company like PromptPath.AI means issuing new shares from the startup company's treasury of authorized shares. Issuing new shares dilutes the value of the shares of all existing

Complaint
Page 8 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

shareholders: each founder's percentage of ownership goes down even though their absolute number of shares stays the same.

48.     It is commonplace for venture capitalist investors in startup companies like PromptPath.AI to insist that the option pool be sized "pre-money," meaning that the option pool is created as if it already existed before the new investments come in; this approach puts all (or most) of the option pool dilution on the founders and earlier holders, not the new investors. Thus, issuing new shares dilutes the value of the founders' shares. Malcolm Thorne acutely understood that such dilution would happen to PromptPath.AI as it sought and obtained investments, and he wanted to minimize that dilution. Maxwell Steckler came to the understand this dilution risk as well, and he too wanted to minimize dilution of the value of his stock.

49.     At all relevant times, Malcolm Thorne understood that minimizing the dilution of his PromptPath.AI shares could lead to a greater financial outcome for himself and his family in a successful exit; this is why Malcolm Thorne wanted to minimize the dilution of his personal holdings of PromptPath.AI shares.

50.     At all relevant times, Maxwell Steckler understood that minimizing the dilution of his PromptPath.AI shares could lead to a greater financial outcome for himself and his family in a successful exit; this is why Maxwell Steckler wanted to minimize the dilution of his personal holdings of PromptPath.AI shares.

C.     **PromptPath.AI Achieved a Major Milestone Causing the Executive Team to Focus on Building Generational Wealth for Themselves**

51.     Product–market fit is a major milestone in a startup company's growth. A startup company achieves product-market fit when its product satisfies a strong market demand and when customers are paying for the product.

Complaint
Page 9 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

52.    Achieving product–market fit is the green light for a startup company and makes the company more attractive to investors, which allows the company to then move to the scaling and growth phase.

53.    By June of 2025, PromptPath.AI had identified automobile dealerships as the clear target market.

54.    By June of 2025, PromptPath.AI had paying automotive dealership customers who were happily using PromptPath.AI's artificial intelligence product.

55.    By June of 2025, Malcolm Thorne believed that PromptPath.AI's artificial intelligence product had achieved the product–market fit milestone.

56.    By June of 2025, Malcolm Thorne was telling Kevin Root, Maxwell Steckler, investors, and pilot dealers that PromptPath.AI's artificial intelligence product had achieved the product–market fit milestone.

57.    By June of 2025, Maxwell Steckler believed that PromptPath.AI's artificial intelligence product had achieved the product–market fit milestone.

58.    By June of 2025, Kevin Root believed that PromptPath.AI's artificial intelligence product had achieved the product–market fit milestone.

59.    Meeting the product–market fit milestone in June of 2025 caused Malcolm Thorne to be highly optimistic about the potential value of PromptPath.AI and his shares of PromptPath.AI stock.

60.    Meeting the product–market fit milestone in June of 2025 caused Maxwell Steckler to be highly optimistic about the potential value of PromptPath.AI and his shares of PromptPath.AI stock.

Complaint
Page 10 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

61.     Meeting the product–market fit milestone in June of 2025 caused Kevin Root to be highly optimistic about the potential value of PromptPath.AI and his shares of PromptPath.AI stock.

62.     Meeting the product–market fit milestone in June of 2025 led Maxwell Steckler to express his opinion to Kevin Root that the value of the Company would lead to a "generational wealth" outcome for himself and his family in a successful exit or liquidity event (that is, a transaction that would allow the founders to realize the value of their investment).

63.     Prior to joining PromptPath.AI, Malcolm Thorne had a successful startup company outcome that gave him credibility in achieving a "generational wealth" building outcome, so Malcolm Thorne, Kevin Root, and Maxwell Steckler fully believed that PrompthPath.AI was their ticket to achieving a "generational wealth" building outcome.

64.     Meeting the product–market fit milestone in June of 2025 meant that PromptPath.AI needed to hire additional employees and executives to help grow the company. The management team knew at this time that they would need to expand the "option pool" of PromptPath.AI shares for these hires and that increasing that option pool would dilute the value of their PromptPath.AI  shares. The management team also knew that investors would require the company to increase the option pool size "pre-money," and that doing so would cause further dilution.

65.     Malcolm Thorne had a strong aversion to diluting the value of his PromptPath.AI shares, as he repeatedly made known to Kevin Root and Maxwell Steckler.

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

66.    Once PromptPath.AI's artificial intelligence product met the product–market fit milestone, Malcolm Thorne believed that the company needed, as soon as possible, to hire a Chief Revenue Officer to help grow the company.

67.    Once PromptPath.AI's artificial intelligence product met the product–market fit milestone, Malcolm Thorne believed that the company needed to rapidly enroll additional dealer customers, which would support his investor fundraising efforts in 2025; doing so would in turn increase the value of PromptPath.AI's shares for future rounds of investor fundraising. Malcolm Thorne's stated goals were to increase the value of PromptPath.AI's shares on a fast-track basis to allow the founders to maximize the value of their PromptPath.AI's shares.

68.    By June of 2025, Malcom Thorne and Maxwell Steckler knew that PromptPath.AI had an insufficient option pool that could be used to compensate future executive hires and that their shares would be diluted when the Company increased the size of the option pool.

69.    By July of 2025 and thereafter, Maxwell Steckler did not want to lose the opportunity to achieve a "generational wealth" building outcome with PromptPath.AI.

70.    In July of 2025, Malcolm Thorne intended that PromptPath.AI would use the option pool as part of compensation packages offered to critical future executive hires, including a Chief Revenue Officer.

71.    In July of 2025, Maxwell Steckler intended that PromptPath.AI would use the option pool as part of compensation packages offered to critical future executive hires, including a Chief Revenue Officer.

Complaint
Page 12 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

72.    By July of 2025, Malcolm Thorne had begun to express concerns that the Company option pool was too small and that the Company would be forced to increase the size of the option pool "pre-money." Increasing the size of the option pool would result in the value of the founders' shares being diluted. He wanted to minimize the impact of this dilution on his personal holdings of PromptPath.AI shares.

73.    By July of 2025, Maxwell Stecker had acknowledged that, because the option pool was too small, when the company increased the option pool size "pre-money," the value of the shares owned by himself, Malcolm Thorne, and Kevin Root would be diluted. He also wanted to minimize the impact of this dilution on his personal holdings of PromptPath.AI shares.

74.    In terminating Kevin Root's employment, and then causing PromptPath.AI to exercise its Right of Repurchase under § 2(a) of the Stock Purchase Agreement, Malcolm Thorne and Maxwell Steckler acted to protect their percentage of ownership and avoid dilution at the expense of Kevin Root. Section 2(a) of the Stock Purchase Agreement expressly states that "the Company may decline to exercise its Right of Repurchase or may exercise its Right of Repurchase only with respect to a portion of the Restricted Shares." Because this right was discretionary—not mandatory—the decision to repurchase Root's 2,050,439 unvested shares was a voluntary act requiring board approval. On information and belief, Malcolm Thorne and Maxwell Steckler were the only board members and approved the repurchase themselves; in doing so, they acted as interested directors engaged in a self-interested transaction subject to Delaware's "entire-fairness" standard. The repurchase allowed them to re-use those shares to refresh the option pool without issuing new shares and

Complaint
Page 13 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

thereby avoiding the dilution of their holdings that they had previously acknowledged was imminent.

**D.      Kevin Root Experienced Age Discrimination at PromptPath.AI**

75.      During his employment, Kevin Root was subjected to several ageist comments by Maxwell Steckler, including being referred to as "old man." This comment constituted a negative remark on Kevin Root's age.

76.      In an Executive Leadership Meeting that occurred on or around June 30, 2025, Maxwell Steckler made the ageist comment that Kevin Root "was out of touch with the customers" (dealers and sales reps) [because] "they are all millennials using phones for everything now." Maxwell Steckler's comments that Kevin "was out of touch with the customers" (dealers and sales reps) [because] "they are all millennials using phones for everything now" constituted a negative remark on Kevin Root's age. Malcolm Thorne said nothing about this derogatory, ageist statement.

77.      In this same Executive Leadership Meeting, Maxwell Steckler made another ageist comment about Kevin Root's "waterfall-like approach" to product development. The term "waterfall-like approach" refers to the "waterfall" model of forecasting a software development life cycle. The waterfall model is considered an old-fashioned and out of date methodology. Thus, Maxwell Steckler's comment that Kevin Root  was using a "waterfall-like approach" constituted a negative remark on Kevin Root's age. Malcolm Thorne said nothing about this ageist statement at the time.

78.      The next day in a 1:1 meeting between Malcolm Thorne and Kevin Root, Malcolm Thorne confirmed that Maxwell Steckler's "waterfall-like approach" comment was derogatory and out of line. However, Malcolm Thorne said nothing

Complaint
Page 14 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

about Maxwell Steckler's ageist comment that Kevin Root "was out of touch with the customers (dealers and sales reps) [because] they are all millennials using phones for everything now."

**E.    PromptPath.AI Blindsided Kevin Root by Terminating His Employment**

79.    Kevin Root was absent from work attending a family funeral in Tennessee from July 31 to August 3, 2025.

80.    On August 4, 2025, Kevin Root returned to work following the family funeral. That same day, Maxwell Steckler and Malcolm Thorne met with Kevin Root and summarily terminated his employment with PromptPath.AI.

81.    Neither Malcolm Thorne nor Maxwell Steckler informed Kevin Root that his employment was being terminated for "cause" as that term is defined in the Stock Purchase Agreement.

82.    PromptPath.AI did not terminate  Root's for "cause" as that term is defined in the Stock Purchase Agreement.

83.    During the August 4 termination meeting, Malcolm Thorne told Kevin Root that he was being "separated" from the company, and they cited a handful of pretextual performance issues.

84.    Malcolm Thorne and Maxwell Steckler knew that, because Kevin Root's employment was terminated on August 4, 2025, the Company could, but was not required to, repurchase 2,050,439 shares of PromptPath.AI stock under the Stock Purchase Agreement. They also knew that choosing to exercise this discretionary right of repurchase would immediately increase their relative ownership percentages as remaining founders without issuing new stock. Such a decision therefore conferred a

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

direct personal benefit on Malcolm Thorne and Maxwell Steckler and constituted self-dealing under Delaware law.

85.    During a meeting that occurred on August 5, Maxwell Steckler and Malcolm Thorne cited the following issues as the basis for the termination of Kevin Root's employment:

85.1    Kevin Root was "not moving fast enough."

85.2    They (Maxwell Steckler and Malcolm Thorne) were putting in far more hours than Kevin Root, regularly working weekends when Kevin Root was not.

85.3    Kevin Root was not carrying his weight relative to them (Maxwell Steckler and Malcolm Thorne); and

85.4    "I have never seen you operate quickly. It's not in your nature." (Maxwell Steckler).

86.    The statements quoted in paragraphs 85.1 to 85.1 are ageist comments and direct evidence of age discrimination.

89.    During this August 5 meeting, Maxwell Steckler and Malcolm Thorne told Kevin Root that they could announce that his termination was in fact a retirement and they pressured and tried to coerce Kevin Root to agree to this false announcement. They made this proposal and statement because Kevin Root is 64 years old.

87.    During the August 5 meeting, Malcolm Thorne suggested to Kevin Root, "[L]ooking at your personal situation, you don't want this treadmill. If someone came to me, put a strong team in place for them to execute, and I could keep a portion of my equity and I could retire tomorrow, it's a pretty good deal." This statement is direct

Complaint
Page 16 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

evidence of age discrimination, and Plaintiff alleges that this statement reflected Malcolm Thorne's view that Kevin Root's departure would free up equity without increasing the option pool and thus without diluting his or Maxwell Steckler's holdings.

88.    Malcolm Thorne pressured and attempted to coerce Kevin Root to falsely agree that he had retired on August 5, at the August 5 meeting, and Malcolm Thorne presented Kevin Root with a Confidential Severance Agreement and General Release that included the following language, in section 2(b): "*Mutual Separation Messaging*. The Company agrees to communicate about Employee's separation as a mutually agreed separation with mutually agreed upon messaging." PromptPath.AI and Malcolm Thorne intended the *Mutual Separation Messaging* clause to pressure, coerce and cause Kevin Root to agree that the Company could falsely announce that he had decided to retire, which would be credible because Kevin Root is 64 years old. This is direct evidence of age discrimination.

89.    A true and correct copy of the Confidential Severance Agreement and General Release agreement is attached as Exhibit 2 to this Complaint.

90.    At this August 5 meeting, Malcolm Thorne pressed Kevin Root to agree that the Company could falsely announce that Kevin Root had voluntarily retired. Malcolm Thorne pressured and attempted to coerce Kevin Root further by stating that he had until the close of business on August 5 to agree to this proposal.

91.    After Kevin Root's employment was terminated, the Company later stripped him of the opportunity to receive 2,050,439 unvested shares of PromptPath.AI stock at a purchase price of $0.0001 per share. At that time, the Company's available "option pool" of shares was nearly depleted. Malcolm Thorne

Complaint
Page 17 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

later texted Kevin Root "we are working on issuing stock options for new employees prior to when our 409A expires later this month" — a message consistent with a plan to re-grant some of Kevin Root's repurchased shares to those hires.

92. Shortly after August 5, Malcolm Thorne hired Tony T. Graham as PromptPath.AI's Chief Revenue Officer, replacing Kevin Root on the executive leadership team. This sequence provides circumstantial evidence that Kevin Root's unvested shares, repurchased by PromptPath.AI, were used as an option-pool refresh to avoid diluting the value of shares owned by Malcolm Thorne and Maxwell Steckler.

93. On August 14, 2025, Malcolm Thorne sent a text message to Kevin Root stating, "[W]e are working on issuing stock options for new employees prior to when our 409A expires later this month. Do you intend to resign from the board or do you want us to do a stockholder consesnt [*sic*] to remove you?"

94. On August 21, 2025, Kevin Root was removed from the PromptPath.AI board. At all relevant times after this date, PromptPath.AI's board consisted only of Malcolm Thorne and Maxwell Steckler.

95. At the time of the termination and repurchase of Plaintiff's shares, the Company was preparing to raise additional capital through a Simple Agreement for Future Equity ("SAFE") financing. Malcolm Thorne and Maxwell Steckler understood that maintaining a larger personal percentage of outstanding common stock prior to the SAFE, and any subsequent priced round, would materially benefit them in future conversions of SAFE instruments into equity. This created an increased incentive for them to avoid personal dilution, including through the repurchase of Plaintiff's unvested shares rather than increasing the size of the option pool.

Complaint
Page 18 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

96.    On August 21, 2025, Kevin Root was removed as a director of PromptPath.AI.

97.    On August 22, 2025, PromptPath.AI exercised its right to repurchase 2,050,439 unvested shares from Kevin Root.

98.    Under Section 2(a) of the Stock Purchase Agreement, PromptPath.AI was not required to repurchases these 2,050,439 unvested shares from Kevin Root.

99.    Section 2(a) of the Stock Purchase Agreement permitted the Company to decline to repurchase these shares from Kevin Root.

100.    Upon information and belief, Malcolm Thorne, as an interested director, affirmatively decided that PromptPath.AI should repurchase these 2,050,439 unvested shares from Kevin Root.

101.    Upon information and belief, Maxwell Steckler, as an interested director, affirmatively decided that PromptPath.AI should repurchase these 2,050,439 unvested shares from Kevin Root.

102.    Both Malcolm Thorne and Maxwell Steckler were interested directors with respect to PromptPath.AI's decision to repurchase these 2,050,439 unvested shares from Kevin Root; Plaintiff is informed and believes, and based thereon alleges, that and no disinterested or independent directors reviewed or approved the repurchase decision.

103.    Plaintiff is informed and believes, and based thereon alleges, that no corporate purpose justified the repurchase of his unvested shares. The Company has produced no contemporaneous board minutes, memoranda, valuations, or analyses supporting the repurchase, further evidencing that the decision served the personal

Complaint
Page 19 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

financial interests of Malcolm Thorne and Maxwell Steckler rather than any legitimate business objective.

104. Divesting Kevin Root of the opportunity to receive these 2,050,439 unvested shares enabled Maxwell Steckler and Malcolm Thorne to minimize the dilution of their personal shares of PromptPath.AI.

105. Kevin Root's base salary was $120,000 per year, as reflected in the Company's financial model.

106. $120,000 is a liquidated sum.

107. Kevin Root agreed to defer payment of his salary until the Company "had revenue."

108. Kevin Root did not agree that he would never be paid a salary at all; instead, he expected to be paid deferred compensation when the Company "had revenue."

109. On July 14, 2025, the Company began receiving revenue.

110. August 15, 2025, was the end of PromptPath.AI's next established pay period following the August 4 termination date (the "Next Established Pay Date").

111. PromptPath.AI. did not pay Kevin Root on the Next Established Pay Date.

112. Following the August 4 termination date, Kevin Root demanded payment of the $125,000.00 loan he had made to the Company; the Company refused to pay.

113. At the time that his employment with PromptPath.AI was terminated, Kevin Root intended to continue to work for at least three additional years.

Complaint
Page 20 of 30

**F.      Kevin Root's Statutory Demand to Inspect PromptPath.AI's Books and Records Was Ignored**

114.    Incorporating Services, Ltd. is PromptPath.AI's Delaware registered agent.

115.    On December 5, 2025, Kevin Root caused a statutory demand under 8 Del. C. § 220 seeking copies and an inspection of PromptPath.AI's Books and Records to be delivered via legal messenger on PromptPath.AI's Delaware registered agent.

116.    A true and correct copy of this statutory demand to inspect is attached as Exhibit 3.

117.    A true and correct copy of an affidavit from the processor showing delivery on December 5, 2025 is attached as Exhibit 4.

118.    Kevin Root's statutory demand seeking copies and an inspection of PromptPath.AI's Books and Records was for a proper purpose.

119.    Under Delaware law, the Company was required to respond within five business days. PromptPath.AI failed to respond at all.

120.    The Company's failure and refusal to comply with its statutory obligations is further evidence of bad faith, concealment of self-interested conduct, and breach of fiduciary duties by Malcolm Thorne and Maxwell Steckler.

121.    Despite Kevin Root's statutory demand for corporate records and books, no contemporaneous written record, board minutes, or valuation analysis has been produced to justify the repurchase decision.

## IV.    CAUSES OF ACTION

Complaint
Page 21 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

**A.    First Cause of Action (Against All Defendants): Age Discrimination in Violation of the Washington Law Against Discrimination**

122.    Plaintiff repeats and incorporates the allegations of the preceding paragraphs.

123.    Under the Washington Law Against Discrimination, employers cannot discharge an employee on the basis of age. RCW 49.60.180(2).

124.    The Washington Law Against Discrimination affords a robust remedy for employees who are illegally terminated because of their age. RCW 46.60.030 states in part:

> Any person deeming himself . . . injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees or any other appropriate remedy authorized by this chapter or the United States Civil Rights Act of 1964 as amended, or the Federal Fair Housing Amendments Act of 1988 (42 U.S.C. Sec. 3601 *et seq.*).

125.    Defendants PromptPath.AI, Maxwell Steckler, and Malcom Thorne terminated Kevin Root because of his age, in violation of the Washington Law Against Discrimination. *See* RCW 49.60.180(2).

126.    The stated reasons for termination were a pretext.

127.    An employer's effort to pressure and coerce an employee into falsely characterizing an involuntary termination as a "retirement" by close of business that day, particularly when paired with multiple deragatory comments about age or "slowing down," and being "out of touch" is direct evidence of age-based animus and improper motive.

Complaint
Page 22 of 30

128.    As a result, Plaintiff has suffered lost wages, lost vesting of 2,050,439 unvested shares at a purchase price of $0.0001 per share, lost medical benefits, emotional distress, and other damages in amounts to be proven at trial.

**B.      Second Cause of Action (Against the Steckler Defendants, the Steckler Community Estate, and Thorne): Breaches of Fiduciary Duty**

129.    Plaintiff repeats and incorporates the allegations of the preceding paragraphs.

130.    Maxwell Steckler and Malcolm Thorne, as officers and directors of PromptPath.AI (a Delaware corporation), owed fiduciary duties of care, loyalty, and good faith to PromptPath.AI and to its shareholders, including Kevin Root.

131.    Under Delaware law, directors and controlling officers must act in the best interests of all shareholders and must not use their control to advance their own personal economic interests at the expense of others.

132.    By causing PromptPath.AI to exercise the discretionary Right of Repurchase in § 2(a) of Root's Stock Purchase Agreement—despite no requirement to do so—Malcolm Thorne and Maxwell Steckler used their control of the board to engage in a self-interested transaction. The repurchase of Root's 2,050,439 unvested shares and their subsequent reallocation to the option pool directly benefited Malcolm Thorne and Maxwell Steckler by preserving or increasing their proportional ownership and avoiding dilution that would otherwise have occurred through the creation of a new option pool. Because they were the only directors involved in approving or effecting the repurchase, the transaction lacked disinterested or independent review and is subject to Delaware's entire-fairness standard.

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

133.   Because Malcolm Thorne and Maxwell Steckler were interested directors, the repurchase transaction is subject to Delaware's "entire fairness" standard, which requires Defendants to demonstrate both fair dealing and fair price:

> The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed [corporate action], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.... However,  the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

*Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 162-1163 (Del. 1995).

134.   Malcolm Thorne and Maxwell Steckler cannot meet this burden because they initiated, approved, and personally benefitted from the repurchase without independent oversight, and without any indication that the repurchase served a legitimate corporate purpose.

135.   As a direct and proximate result of these breaches of fiduciary duties, Plaintiff suffered substantial damages, including (a) the loss of 2,050,439 unvested shares of PromptPath.AI stock at $0.0001 per share, (b) the corresponding reduction in equity value that would have accrued through future appreciation or sale, and (c) consequential damages arising from the wrongful termination and deprivation of his shareholder rights. Plaintiff is entitled to equitable relief restoring the shares or awarding their fair value, together with compensatory damages, prejudgment interest, and attorneys' fees.

Complaint
Page 24 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

**C.   Third Cause of Action (Against Defendant PromptPath.AI): Conversion**

136.   Plaintiff repeats and incorporates the allegations of the preceding paragraphs.

137.   A person converts property by willfully interfering, without lawful justification, with the possession of the person entitled to it. *Kruger v. Horton*, 106 Wn.2d 738, 743, 725 P.2d 417 (1986) (citation omitted). Money may be the subject of conversion if the party charged with conversion wrongfully received the money or failed to honor an obligation to return the money to the party claiming it. *See, e.g., Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys.*, 104 Wn.2d 353, 378, 705 P.2d 1195 (1995).

138.   Defendant PromptPath.AI wrongfully retained Plaintiff's $125,000 loan to the Company.

139.   Following the August 4 termination date, Kevin Root demanded that the Company repay him the $125,000 loan to the Company, plus interest from June 9, 2023, the date Mr. Root transferred the last portion of the loan to the Company, to the date this loan is paid; Defendants refused to do so.

140.   $125,000 is a liquidated sum.

141.   Defendant's conduct constitutes conversion entitling Plaintiff to an award of $125,000.00, plus interest from June 9, 2023, the date Mr. Root transferred the last portion of the loan to the Company, plus statutory prejudgment interest.

**D.   Fourth Cause of Action (Against All Defendants): Unjust Enrichment**

142.   Plaintiff repeats and incorporates the allegations of the preceding paragraphs

143.   To recover on a claim for unjust enrichment, a plaintiff must establish three elements: (1) the defendants received a benefit; (2) the received benefit is at the

Complaint
Page 25 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

plaintiff's expense; and (3) the circumstances make it unjust for the defendants to retain the benefit without payment. *Young v. Young*, 164 Wn.2d 477, 484-85, 191 P.3d 1258 (2008).

144.    Defendants received a benefit at Kevin Root's expense in at least the following ways:

> 144.1    By wrongfully terminating Kevin Root and then stripping him of his unvested shares, Maxwell Steckler and Malcolm Thorne could minimize  the dilution of their personal holdings of PromptPath.AI shares; and
>
> 144.2.    By not paying the $125,000.00 loan owed to Kevin Root the Company retained cash it owed to Kevin Root.

145.    The circumstances make it unjust for the Defendants to retain the benefit without payment.

146.    Defendants' conduct constitutes unjust enrichment, entitling Plaintiff to an award of $125,000.00, plus interest from June 9, 2023, the date that Kevin Root transferred the last portion of the loan to the Company, plus statutory prejudgment interest.

147.    Defendants' conduct constitutes unjust enrichment, entitling Plaintiff to an award of 2,050,439 unvested shares of PromptPath.AI stock at a purchase price of $0.0001 per share.

**E.    Fifth Cause of Action (Against the Steckler Defendants and the Steckler Community Estate): Promissory Estoppel**

148.    Plaintiff repeats and incorporates the allegations of the preceding paragraphs.

Complaint
Page 26 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

149. Maxwell Steckler made a personal commitment and promised Kevin Root that he (Steckler) would cooperate with Kevin Root to ensure they maintained control of the Company's major decisions, which cooperation would ensure that Malcolm Thorne would not take control of the Company. The decision to terminate Kevin Root, a co-founder of the Company, would be a major decision.

150. Maxwell Steckler should reasonably have expected that his personal commitments and promises would cause Kevin Root to change his position by agreeing to allow Malcolm Thorne to invest in and become one of the directors and the CEO of PromptPath.AI.

151. Because of Maxwell's Steckler's personal commitments and promises to him, Kevin Root actually did change his position in regard to Malcolm Thorne investing in and becoming one of the directors and the CEO of PromptPath.AI.

152. When Kevin Root changed his position, he was relying on the personal commitments and promises made by Matthew Steckler.

153. Kevin Root was justified in relying on the personal commitments and promises made by Matthew Steckler in light of their long friendship.

154. Injustice can be avoided only if the personal commitment promise is enforced by putting Kevin Root into the position that he had before he changed his position in reliance on the promise made by Matthew Steckler.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

A.    For an award of lost back pay, front pay, and other compensatory damages in amounts to be proven at trial;

Complaint
Page 27 of 30

B. For equitable relief under Delaware law, including (a) rescission of the repurchase transaction, (b) restoration or re-issuance to Plaintiff of the 2,050,439 unvested shares of PromptPath.AI stock at a purchase price of $0.0001 per share, or (c) imposition of a constructive trust or disgorgement order upon any shares or economic value received by Defendants as a result of the repurchase;

C. For a declaration that the discretionary exercise of the Right of Repurchase under § 2(a) of Plaintiff's Stock Purchase Agreement was a self-interested transaction lacking entire fairness and therefore voidable or void under Delaware law;

D. For an order requiring PromptPath.AI, Malcolm Thorne, and Maxwell Steckler to provide full accounting of all equity grants or option-pool issuances made following Plaintiff's termination and repurchase;

E. For equitable accounting and inspection of all books and records relevant to the repurchase decision, dilution modeling, option-pool usage, and fundraising efforts;

F. For an award of out-of-pocket expenses incurred for medical insurance and other benefits lost as a result of the unlawful termination;

G. For repayment of the $125,000 loan together with prejudgment interest at the statutory rate from June 9 2023, and any additional equitable or statutory interest due;

Complaint
Page 28 of 30

LARSEN WALTERS PLLC
11120 NE 2nd Street, Suite 100
Bellevue, WA 98004
(206) 669-6986

H.   For restitution or disgorgement of all benefits unjustly retained by Defendants through the repurchase and reallocation of Plaintiff's shares;

I.   For punitive or exemplary damages as permitted by law for willful and malicious conduct in breach of fiduciary duties and age discrimination;

J.   For attorneys' fees, expert fees, and costs as permitted by statute and equity;

K.   For pre- and post-judgment interest on all liquidated sums;

L.   For such other and further legal or equitable relief—including specific performance, rescission, or injunction—as the Court deems just and proper.

DATED this 23rd day of December 2025.

LARSEN WALTERS PLLC

Mark D. Walters, WSBA No. 25537
Daniel J. Gunter, WSBA No. 27491
Attorneys for Plaintiff, Kevin Root

11120 NE Second Street, Suite 100
Bellevue, WA 98004

Mark D. Walters
Telephone: (206) 669-6986
Email: mwalters@larsenwalters.com

Complaint
Page 29 of 30

Daniel J. Gunter
Telephone: (206) 498-9891
Email: dgunter@larsenwalters.com

Complaint
Page 30 of 30

# Exhibit 1

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT is entered into as of November 28, 2023, by **PROMPTPATH.AI INC.**, a Delaware corporation (the "Company"), and **KEVIN ROOT** (the "Purchaser").

## SECTION 1.  ACQUISITION OF SHARES.

(a)    **Transfer**.  On the terms and conditions set forth in this Agreement, the Company agrees to transfer 4,473,684 Shares to the Purchaser.  The transfer shall occur at the offices of the Company on the date set forth above or at such other place and time as the parties may agree.

(b)    **Consideration**.  The Purchaser agrees to assign to the Company certain intellectual property rights, pursuant to the Technology Assignment Agreement attached hereto as Exhibit II, in exchange for the Purchased Shares. The Company and the Purchaser agree that the fair market value of such consideration is $447.37 or $0.0001 per Purchased Share. The Purchase Price is agreed to be at least 100% of the Fair Market Value of the Purchased Shares. Payment shall be made on the transfer date by execution and delivery of the Technology Assignment Agreement.

(c)    **Defined Terms**.  Capitalized terms not defined above are defined in Section 14 of this Agreement.

## SECTION 2.  RIGHT OF REPURCHASE.

(a)    **Scope of Repurchase Right**.  Until they vest in accordance with Subsection (b) below, the Purchased Shares shall be Restricted Shares and shall be subject to the Company's Right of Repurchase.  The Company, however, may decline to exercise its Right of Repurchase or may exercise its Right of Repurchase only with respect to a portion of the Restricted Shares.  The Company may exercise its Right of Repurchase only during the Repurchase Period following the termination of the Purchaser's Service, but the Right of Repurchase may be exercised automatically under Subsection (d) below.  If the Right of Repurchase is exercised, the Company shall pay the Purchaser an amount equal to the Purchase Price for each of the Restricted Shares being repurchased.

(b)    **Lapse of Repurchase Right**.  The Right of Repurchase shall lapse with respect to 1/48th of the Purchased Shares when the Purchaser completes each month of continuous Service after the Vesting Commencement Date.  If the Company is subject to a Change in Control before the Purchaser's Service terminates and the Purchaser is subject to an Involuntary Termination within 12 months after the Change in Control, then the Right of Repurchase shall lapse with respect to 100% of any remaining Restricted Shares.

(c)    **Escrow**.  Upon issuance, the certificate(s) for Restricted Shares shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement.  Any additional or exchanged securities or other property described in Subsection (f)

below shall immediately be delivered to the Company to be held in escrow.  All ordinary cash dividends on Restricted Shares (or on other securities held in escrow) shall be paid directly to the Purchaser and shall not be held in escrow.  Restricted Shares, together with any other assets held in escrow under this Agreement, shall be (i) surrendered to the Company for repurchase upon exercise of the Right of Repurchase or the Right of First Refusal or (ii) released to the Purchaser upon his or her request to the extent that the Shares have ceased to be Restricted Shares (but not more frequently than once every six months).  In any event, all Purchased Shares that have ceased to be Restricted Shares, together with any other vested assets held in escrow under this Agreement, shall be released within 90 days after the earlier of (i) the termination of the Purchaser's Service or (ii) the lapse of the Right of First Refusal.

(d)    **Exercise of Repurchase Right**.  The Company shall be deemed to have exercised its Right of Repurchase automatically for all Restricted Shares as of the commencement of the Repurchase Period, unless the Company during the Repurchase Period notifies the holder of the Restricted Shares pursuant to Section 9 that it will not exercise its Right of Repurchase for some or all of the Restricted Shares.  The Company shall pay to the holder of the Restricted Shares the purchase price determined under Subsection (a) above for the Restricted Shares being repurchased.  Payment shall be made in cash or cash equivalents and/or by canceling indebtedness to the Company incurred by the Purchaser in the purchase of the Restricted Shares.  The certificate(s) representing the Restricted Shares being repurchased shall be delivered to the Company.

(e)    **Termination of Rights as Stockholder**.  If the Right of Repurchase is exercised in accordance with this Section 2 and the Company makes available the consideration for the Restricted Shares being repurchased, then the person from whom the Restricted Shares are repurchased shall no longer have any rights as a holder of the Restricted Shares (other than the right to receive payment of such consideration).  Such Restricted Shares shall be deemed to have been repurchased pursuant to this Section 2, whether or not the certificate(s) for such Restricted Shares have been delivered to the Company or the consideration for such Restricted Shares has been accepted.

(f)    **Additional or Exchanged Securities and Property**.  In the event of a merger or consolidation of the Company with or into another entity, any other corporate reorganization, a stock split, the declaration of a stock dividend, the declaration of an extraordinary dividend payable in a form other than stock, a spin-off, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Company's outstanding securities, any securities or other property (including cash or cash equivalents) that are by reason of such transaction exchanged for, or distributed with respect to, any Restricted Shares shall immediately be subject to the Right of Repurchase.  Appropriate adjustments to reflect the exchange or distribution of such securities or property shall be made to the number and/or class of the Restricted Shares.  Appropriate adjustments shall also be made to the price per share to be paid upon the exercise of the Right of Repurchase, provided that the aggregate purchase price payable for the Restricted Shares shall remain the same.  In the event of a merger or consolidation of the Company with or into another entity or any other corporate reorganization, the Right of Repurchase may be exercised by the Company's successor.

2

(g)    **Transfer of Restricted Shares**. The Purchaser shall not transfer, assign, encumber or otherwise dispose of any Restricted Shares without the Company's written consent, except as provided in the following sentence. The Purchaser may transfer Restricted Shares to one or more members of the Purchaser's Immediate Family or to a trust established by the Purchaser for the benefit of the Purchaser and/or one or more members of the Purchaser's Immediate Family, provided in either case that the Transferee agrees in writing on a form prescribed by the Company to be bound by all provisions of this Agreement. If the Purchaser transfers any Restricted Shares, then this Agreement shall apply to the Transferee to the same extent as to the Purchaser.

(h)    **Assignment of Repurchase Right**. The Board of Directors may freely assign the Company's Right of Repurchase, in whole or in part. Any person who accepts an assignment of the Right of Repurchase from the Company shall assume all of the Company's rights and obligations under this Section 2.

(i)    **Part-Time Employment and Leaves of Absence**. If the Purchaser commences working on a part-time basis, then the Company may adjust the vesting schedule set forth in Subsection (b) above. If the Purchaser goes on a leave of absence, then the Company may adjust the vesting schedule set forth in Subsection (b) above in accordance with the Company's leave of absence policy or the terms of such leave. Except as provided in the preceding sentence, Service shall be deemed to continue while the Purchaser is on a *bona fide* leave of absence, if (i) such leave was approved by the Company in writing and (ii) continued crediting of Service is expressly required by the terms of such leave or by applicable law (as determined by the Company). Service shall be deemed to terminate when such leave ends, unless the Purchaser immediately returns to active work.

## SECTION 3.  RIGHT OF FIRST REFUSAL.

(a)    **Right of First Refusal**. In the event that the Purchaser proposes to sell, pledge or otherwise transfer to a third party any Purchased Shares, or any interest in Purchased Shares, the Company shall have the Right of First Refusal with respect to all (and not less than all) of such Purchased Shares. If the Purchaser desires to transfer Purchased Shares, the Purchaser shall give a written Transfer Notice to the Company describing fully the proposed transfer, including the number of Purchased Shares proposed to be transferred, the proposed transfer price, the name and address of the proposed Transferee and proof satisfactory to the Company that the proposed sale or transfer will not violate any applicable federal, State or foreign securities laws. The Transfer Notice shall be signed both by the Purchaser and by the proposed Transferee and must constitute a binding commitment of both parties to the transfer of the Purchased Shares. The Company shall have the right to purchase all, and not less than all, of the Purchased Shares on the terms of the proposal described in the Transfer Notice (subject, however, to any change in such terms permitted under Subsection (b) below) by delivery of a notice of exercise of the Right of First Refusal within 30 days after the date when the Transfer Notice was received by the Company.

(b)    **Transfer of Shares**. If the Company fails to exercise its Right of First Refusal within 30 days after receiving the Transfer Notice, the Purchaser may, not later than 90 days after the Company received the Transfer Notice, conclude a transfer of the Purchased Shares subject to the Transfer Notice on the terms and conditions described in the Transfer Notice, provided that any such sale is made in compliance with applicable federal, State and foreign

3

securities laws and not in violation of any other contractual restrictions to which the Purchaser is bound. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the Purchaser, shall again be subject to the Right of First Refusal and shall require compliance with the procedure described in Subsection (a) above. If the Company exercises its Right of First Refusal, the parties shall consummate the sale of the Purchased Shares on the terms set forth in the Transfer Notice within 60 days after the Company received the Transfer Notice (or within such longer period as may have been specified in the Transfer Notice); provided, however, that in the event the Transfer Notice provided that payment for the Purchased Shares was to be made in a form other than cash or cash equivalents paid at the time of transfer, the Company shall have the option of paying for the Purchased Shares with cash or cash equivalents equal to the present value of the consideration described in the Transfer Notice.

(c)     **Additional or Exchanged Securities and Property**. In the event of a merger or consolidation of the Company with or into another entity, any other corporate reorganization, a stock split, the declaration of a stock dividend, the declaration of an extraordinary dividend payable in a form other than stock, a spin-off, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Company's outstanding securities, any securities or other property (including cash or cash equivalents) that are by reason of such transaction exchanged for, or distributed with respect to, any Purchased Shares subject to this Section 3 shall immediately be subject to the Right of First Refusal. Appropriate adjustments to reflect the exchange or distribution of such securities or property shall be made to the number and/or class of the Purchased Shares subject to this Section 3.

(d)     **Termination of Right of First Refusal**. Any other provision of this Section 3 notwithstanding, in the event that the Stock is readily tradable on an established securities market when the Purchaser desires to transfer Purchased Shares, the Company shall have no Right of First Refusal, and the Purchaser shall have no obligation to comply with the procedures prescribed by Subsections (a) and (b) above.

(e)     **Permitted Transfers**. This Section 3 shall not apply to (i) a transfer by beneficiary designation, will or intestate succession or (ii) a transfer to one or more members of the Purchaser's Immediate Family or to a trust established by the Purchaser for the benefit of the Purchaser and/or one or more members of the Purchaser's Immediate Family, provided in either case that the Transferee agrees in writing on a form prescribed by the Company to be bound by all provisions of this Agreement. If the Purchaser transfers any Purchased Shares, either under this Subsection (e) or after the Company has failed to exercise the Right of First Refusal, then this Agreement shall apply to the Transferee to the same extent as to the Purchaser.

(f)     **Termination of Rights as Stockholder**. If the Company makes available, at the time and place and in the amount and form provided in this Agreement, the consideration for the Shares to be purchased in accordance with this Section 3, then after such time the person from whom such Shares are to be purchased shall no longer have any rights as a holder of such Shares (other than the right to receive payment of such consideration in accordance with this Agreement). Such Shares shall be deemed to have been purchased in accordance with the applicable provisions hereof, whether or not the certificate(s) therefor have been delivered as required by this Agreement.

4

(g)    **Assignment of Right of First Refusal**. The Board of Directors may freely assign the Company's Right of First Refusal, in whole or in part. Any person who accepts an assignment of the Right of First Refusal from the Company shall assume all of the Company's rights and obligations under this Section 3.

## SECTION 4. OTHER RESTRICTIONS ON TRANSFER.

(a)    **Purchaser Representations**. In connection with the issuance and acquisition of Shares under this Agreement, the Purchaser hereby represents and warrants to the Company as follows:

(i)    The Purchaser is acquiring and will hold the Purchased Shares for investment for his or her account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(ii)    The Purchaser understands that the Purchased Shares have not been registered under the Securities Act by reason of a specific exemption therefrom and that the Purchased Shares must be held indefinitely, unless they are subsequently registered under the Securities Act or the Purchaser obtains an opinion of counsel, in form and substance satisfactory to the Company and its counsel, that such registration is not required. The Purchaser further acknowledges and understands that the Company is under no obligation to register the Purchased Shares.

(iii)    The Purchaser is aware of the adoption of Rule 144 by the Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions, including (without limitation) the availability of certain current public information about the issuer, the resale occurring only after the holding period required by Rule 144 has been satisfied, the sale occurring through an unsolicited "broker's transaction," and the amount of securities being sold during any three-month period not exceeding specified limitations. The Purchaser acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(iv)    The Purchaser will not sell, transfer or otherwise dispose of the Purchased Shares in violation of the Securities Act, the Securities Exchange Act of 1934, or the rules promulgated thereunder, including Rule 144 under the Securities Act. The Purchaser agrees that he or she will not dispose of the Purchased Shares unless and until he or she has complied with all requirements of this Agreement applicable to the disposition of Purchased Shares and he or she has provided the Company with written assurances, in substance and form satisfactory to the Company, that (A) the proposed disposition does not require registration of the Purchased Shares under the Securities Act or all appropriate action necessary for compliance with the registration requirements of the Securities Act or with any

5

exemption from registration available under the Securities Act (including Rule 144) has been taken and (B) the proposed disposition will not result in the contravention of any transfer restrictions applicable to the Purchased Shares under the securities laws or regulations of any state.

(v)     The Purchaser has been furnished with, and has had access to, such information as he or she considers necessary or appropriate for deciding whether to invest in the Purchased Shares, and the Purchaser has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of the Purchased Shares.

(vi)     The Purchaser is aware that his or her investment in the Company is a speculative investment that has limited liquidity and is subject to the risk of complete loss. The Purchaser is able, without impairing his or her financial condition, to hold the Purchased Shares for an indefinite period and to suffer a complete loss of his or her investment in the Purchased Shares.

(b)     **Securities Law Restrictions**. Regardless of whether the offering and sale of Shares under this Agreement have been registered under the Securities Act or have been registered or qualified under the securities laws of any State, the Company at its discretion may impose restrictions upon the sale, pledge or other transfer of the Purchased Shares (including the placement of appropriate legends on stock certificates or the imposition of stop-transfer instructions) if, in the judgment of the Company, such restrictions are necessary or desirable in order to achieve compliance with the Securities Act, the securities laws of any State or any other law.

(c)     **Market Stand-Off**. In connection with any underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Securities Act, including the Company's initial public offering, the Purchaser or a Transferee shall not directly or indirectly sell, make any short sale of, loan, hypothecate, pledge, offer, grant or sell any option or other contract for the purchase of, purchase any option or other contract for the sale of, or otherwise dispose of or transfer, or agree to engage in any of the foregoing transactions with respect to, any Purchased Shares without the prior written consent of the Company or its managing underwriter. Such restriction (the "Market Stand-Off") shall be in effect for such period of time following the date of the public filing of the registration statement relating to the initial public offering (or commencing on the date of the final prospectus relating to any subsequent Offering) as may be requested by the Company or such underwriter. In no event, however, shall such period exceed 180 days. The Market Stand-Off shall in any event terminate two years after the date of the Company's initial public offering. In the event of the declaration of a stock dividend, a spin-off, a stock split, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Company's outstanding securities without receipt of consideration, any new, substituted or additional securities which are by reason of such transaction distributed with respect to any Shares subject to the Market Stand-Off, or into which such Shares thereby become convertible, shall immediately be subject to the Market Stand-Off. In order to enforce the Market Stand-Off, the Company may impose stop-transfer instructions with respect to the Purchased Shares until the end of the applicable stand-off period. The Company's underwriters

6

GDCET\5326609\1 1623.04.27
**Exhibit 1 Page 6**

shall be beneficiaries of the agreement set forth in this Subsection (c). This Subsection (c) shall not apply to Shares registered in the public offering under the Securities Act.

(d)    **Rights of the Company**. The Company shall not be required to (i) transfer on its books any Purchased Shares that have been sold or transferred in contravention of this Agreement or (ii) treat as the owner of Purchased Shares, or otherwise to accord voting, dividend or liquidation rights to, any transferee to whom Purchased Shares have been transferred in contravention of this Agreement.

## SECTION 5. SUCCESSORS AND ASSIGNS.

Except as otherwise expressly provided to the contrary, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon the Purchaser and the Purchaser's legal representatives, heirs, legatees, distributees, assigns and transferees by operation of law, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof.

## SECTION 6. NO RETENTION RIGHTS.

Nothing in this Agreement shall confer upon the Purchaser any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company (or any Parent or Subsidiary employing or retaining the Purchaser) or of the Purchaser, which rights are hereby expressly reserved by each, to terminate his or her Service at any time and for any reason, with or without cause.

## SECTION 7. TAX ELECTION.

The acquisition of the Purchased Shares may result in adverse tax consequences that may be avoided or mitigated by filing an election under Code Section 83(b). Such election may be filed only within 30 days after the date of purchase. The form for making the Code Section 83(b) election is attached to this Agreement as Exhibit I. **The Purchaser should consult with his or her tax advisor to determine the tax consequences of acquiring the Purchased Shares and the advantages and disadvantages of filing the Code Section 83(b) election. The Purchaser acknowledges that it is his or her sole responsibility, and not the Company's, to file a timely election under Code Section 83(b), even if the Purchaser requests the Company or its representatives to make this filing on his or her behalf.**

## SECTION 8. LEGENDS.

All certificates evidencing Purchased Shares shall bear the following legends:

"THE SHARES REPRESENTED HEREBY MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED OR IN ANY MANNER DISPOSED OF, EXCEPT IN COMPLIANCE WITH THE TERMS OF A WRITTEN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER OF THE SHARES (OR THE PREDECESSOR IN INTEREST TO THE

7

SHARES).  SUCH AGREEMENT GRANTS TO THE COMPANY CERTAIN RIGHTS OF FIRST REFUSAL UPON AN ATTEMPTED TRANSFER OF THE SHARES AND CERTAIN REPURCHASE RIGHTS UPON TERMINATION OF SERVICE WITH THE COMPANY.  IN ADDITION, THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFER, AS SET FORTH IN SUCH AGREEMENT.  THE SECRETARY OF THE COMPANY WILL UPON WRITTEN REQUEST FURNISH A COPY OF SUCH AGREEMENT TO THE HOLDER HEREOF WITHOUT CHARGE."

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION THEREOF UNDER SUCH ACT OR AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED."

If required by the authorities of any State in connection with the issuance of the Purchased Shares, the legend or legends required by such State authorities shall also be endorsed on all such certificates.

## SECTION 9.  NOTICE.

All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given:  (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  Notice shall be addressed to the Company at its principal executive office and to the Purchaser at the address that he or she most recently provided to the Company in accordance with this Section 9.

## SECTION 10.  WAIVER OF INFORMATION RIGHTS.

The Purchaser hereby acknowledges and agrees that, except for such information as required to be delivered to the Purchaser by the Company pursuant to any other agreement by and between the Company and the Purchaser, the Purchaser shall have no right to receive any information from the Company by virtue of such Purchaser's purchase of the Shares, ownership of the Shares, or as a result of the Purchaser being a holder of record of stock of the Company. Without limiting the foregoing, to the fullest extent permitted by law, the Purchaser hereby waives the Purchaser's inspection rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company, the Company's capital stock or the Shares (the "Inspection Rights").  The Purchaser hereby covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights.

8

## SECTION 11.  COUNSEL ACKNOWLEDGMENT

The Purchaser hereby acknowledges that Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP, counsel for the Company, (1) solely represents the Company in the transactions contemplated by this Agreement and any other matters relating to the Company arising between the Company and the Purchaser and (2) has not represented, or agreed to represent, Purchaser in connection with such transaction or matters. Purchaser acknowledges that Purchaser has had the opportunity to consult independent counsel.  In addition, the Purchaser hereby acknowledges that Purchaser has had an opportunity to ask for information relevant to the subject matter of this paragraph and hereby confirms that any such requests have been fully satisfied.

## SECTION 12.  ENTIRE AGREEMENT.

This Agreement constitutes the entire contract between the parties hereto with regard to the subject matter hereof.  It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof.

## SECTION 13.  CHOICE OF LAW.

This Agreement shall be governed by and construed under the laws of the State of Delaware, as such laws are applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware.

## SECTION 14.  DEFINITIONS.

(a)    "**Agreement**" shall mean this Stock Purchase Agreement.

(b)    "**Board of Directors**" shall mean the Board of Directors of the Company, as constituted from time to time.

(c)    "**Cause**" shall mean:

(i)    An unauthorized use or disclosure by the Purchaser of the Company's confidential information or trade secrets, which use or disclosure causes material harm to the Company;

(ii)    A material breach by the Purchaser of any agreement between the Purchaser and the Company;

(iii)    A material failure by the Purchaser to comply with the Company's written policies or rules;

(iv)    The Purchaser's conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any State thereof;

(v)    The Purchaser's gross negligence or willful misconduct;

9

(vi)    A continuing failure by the Purchaser to perform assigned duties after receiving written notification of such failure from the Board of Directors; or

(vii)    A failure by the Purchaser to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested the Purchaser's cooperation.

(d)    "**Change in Control**" shall mean (i) the consummation of a merger or consolidation of the Company with or into another entity, (ii) the sale of all or substantially all of the assets of the Company, either in one transaction or a series of related transactions or (iii) the dissolution, liquidation or winding up of the Company. The foregoing notwithstanding, a merger or consolidation of the Company shall not constitute a "Change in Control" if immediately after such merger or consolidation a majority of the voting power of the capital stock of the continuing or surviving entity, or any direct or indirect parent corporation of such continuing or surviving entity, will be owned by the persons who were the Company's stockholders immediately prior to such merger or consolidation in substantially the same proportions as their ownership of the voting power of the Company's capital stock immediately prior to such merger or consolidation.

(e)    "**Code**" shall mean the Internal Revenue Code of 1986, as amended.

(f)    "**Consultant**" shall mean a person who performs bona fide services for the Company, a Parent or a Subsidiary as a consultant or advisor, excluding Employees and members of the Board of Directors.

(g)    "**Employee**" shall mean any individual who is a common-law employee of the Company, a Parent or a Subsidiary.

(h)    "**Fair Market Value**" shall mean the fair market value of a Share, as determined by the Board of Directors in good faith. Such determination shall be conclusive and binding on all persons.

(i)    "**Good Reason**" shall mean that the Purchaser resigns within 12 months after one of the following conditions has come into existence without his or her consent:

(i)    A reduction in the Purchaser's base salary by more than 10%;

(ii)    A material diminution of the Purchaser's authority, duties or responsibilities; or

(iii)    A relocation of the Purchaser's principal workplace by more than 30 miles.

A condition shall not be considered "Good Reason" unless the Purchaser gives the Company written notice of such condition within 90 days after such condition comes into existence and the Company fails to remedy such condition within 30 days after receiving the Purchaser's written notice.

10

(j)     "**Immediate Family**" shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law and shall include adoptive relationships, or any Spousal Equivalent.

(k)     "**Involuntary Termination**" shall mean the termination of the Purchaser's Service by reason of:

(i)     The involuntary discharge of the Purchaser by the Company (or the Parent or Subsidiary employing him or her) for reasons other than Cause; or

(ii)     The voluntary resignation of the Purchaser for Good Reason.

(l)     "**Parent**" shall mean any corporation (other than the Company) in an unbroken chain of corporations ending with the Company, if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(m)     "**Purchased Shares**" shall mean the Shares purchased by the Purchaser pursuant to this Agreement.

(n)     "**Purchase Price**" shall mean the dollar value of the consideration for which one Share is purchased pursuant to this Agreement, as specified in Section 1(b).

(o)     "**Repurchase Period**" shall mean a period of 180 consecutive days commencing on the date when the Purchaser's Service terminates for any reason, including (without limitation) death or disability.

(p)     "**Restricted Share**" shall mean a Purchased Share that is subject to the Right of Repurchase.

(q)     "**Right of First Refusal**" shall mean the Company's right of first refusal described in Section 3.

(r)     "**Right of Repurchase**" shall mean the Company's right of repurchase described in Section 2.

(s)     "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(t)     "**Service**" shall mean service as an Employee or Consultant.

(u)     "**Share**" shall mean one share of Stock.

(v)     "**Spousal Equivalent**" shall mean an individual who: (A) is in an exclusive, continuous, committed relationship with the Purchaser, has been in that relationship for the twelve (12) months prior to the relevant date and intends to be in that relationship indefinitely; (B) has no such relationship with any other person and is not married to any other person; (C) shares a principal residence with the Purchaser; (D) is at least 18 years of age and legally and mentally

11

competent to consent to contract; (E) is not related by blood to the Purchaser to a degree of kinship that would prevent marriage from being recognized under the law of the state in which the individual and the Purchaser reside; and (F) is jointly responsible with the Purchaser for each other's common welfare and financial obligations.

(w)     "**Stock**" shall mean the Common Stock of the Company.

(x)     "**Subsidiary**" shall mean any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(y)     "**Transferee**" shall mean any person to whom the Purchaser has directly or indirectly transferred any Purchased Share.

(z)     "**Transfer Notice**" shall mean the notice of a proposed transfer of Purchased Shares described in Section 3.

(aa)     "**Vesting Commencement Date**" shall mean June 4, 2023.

12

DocuSign Envelope ID: A668B171-F2BB-48FE-AC26-291F559AB3F8

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

**PURCHASER:**                               **PROMPTPATH.AI INC.**

*Kevin Root*                                 By: _____*Kevin Root*_____
_____             
Kevin Root                                   Name: Kevin Root
                                             Title: CEO

Email Address: kr@promptpath.ai

SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT

EXHIBIT I

## SECTION 83(b) ELECTION

This statement is made under Section 83(b) of the Internal Revenue Code of 1986, as amended, pursuant to Treasury Regulations Section 1.83-2.

(1)    The taxpayer who performed the services is:

    Name:          Kevin Root

    Address:       4866 NE Dotson Loop
                    Bainbridge Island, WA 98110

    Social Security No.: _____

(2)    The property with respect to which the election is made is 4,473,684 shares of the common stock of PromptPath.AI Inc.

(3)    The property was transferred on November 28, 2023.

(4)    The taxable year for which the election is made is the calendar year 2023.

(5)    The property is subject to a repurchase right pursuant to which the issuer has the right to acquire the property at the original purchase price if for any reason taxpayer's service with the issuer is terminated.  The issuer's repurchase right lapses in a series of installments over a four (4)-year period ending on June 3, 2027.

(6)    The fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse) is $0.0001 per share.

(7)    The amount paid for such property is $0.0001 per share.

(8)    A copy of this statement was furnished to PromptPath.AI Inc., for whom taxpayer rendered the services underlying the transfer of such property.

(9)    This statement is executed on _____ ___, _____.

_____     _____
Signature of Spouse (if any)                      Signature of Taxpayer

*Within 30 days after the date of purchase, this election must be filed with the Internal Revenue Service Center where the Purchaser files his or her federal income tax returns.  The filing should be made by registered or certified mail, return receipt requested.  The Purchaser must deliver a copy to the Company.*

EXHIBIT II

## TECHNOLOGY ASSIGNMENT AGREEMENT

## CONFIDENTIAL SEVERANCE AGREEMENT AND GENERAL RELEASE

PromptPath.AI, Inc., on behalf of itself and any of its affiliates, predecessors, successors, assigns, current and former owners, officers, directors, managers, partners, shareholders, board members, members, employees, attorneys, representatives, agents, and insurers (collectively, "the Company"), and Kevin Root ("Employee"), on behalf of Employee and Employee's heirs, executors, successors, agents, and assigns, have agreed, pursuant to this Confidential Severance Agreement and General Release ("Agreement") as follows. For purposes of this Agreement, the Company and Employee are each a "Party" and collectively, the "Parties."

1. **Last Day of Employment.** Employee's last day of employment with the Company will be Tue August 5ᵗʰ, 2025 (the "Separation Date"). Employee will be paid all wages earned, less any applicable withholdings and deductions, in addition to any accrued but unused vacation time, or other paid time off, through the Separation Date.

2. **Consideration.** In consideration for Employee signing this Agreement, not revoking it, and complying with its terms, the Company agrees to provide the Employee with the following:

   a. *Transition Stipend.* A one-time payment of $11,050 (less standard deductions), which is intended to assist Employee with the cost of Employee's continued health care coverage under COBRA, if any, for up to six (6) months (the "Transition Stipend"). Employee is not required to elect COBRA coverage to obtain the Transition Stipend and may use the Transition Stipend for any purpose. This Severance Agreement does not serve as an election of COBRA coverage. Employee will receive separate information and instructions from the Company's third-party service provider regarding COBRA. If employee fails to timely elect COBRA Coverage or if Employee fails to timely pay the costs of COBRA Coverage, COBRA Coverage may be terminated, but this Agreement will remain in full force and effect. This transition stipend will be paid on August 31ˢᵗ, 2025.

   b. *Mutual Separation Messaging.* The Company agrees to communicate about Employee's separation as a mutually agreed separation with mutually agreed upon messaging.

The Transition Stipend and Mutual Messaging are collectively referred to as the "Severance Benefits."

The Company and Employee agree that the monetary Severance Benefits to Employee are subject to applicable withholdings, taxes, deductions, and reporting as wages in accordance with applicable law and that these payments will be processed through the Company's normal payroll procedures. The Company will report the Severance Benefits in accordance with applicable law to the appropriate taxing authorities. Employee agrees that Employee shall be exclusively liable for payment of any and all taxes due on the Severance Benefits, except for the Company's share of any payroll taxes. Employee agrees to indemnify, defend, and hold harmless the Company for any liability incurred by it because of Employee's failure to pay such taxes. Employee further agrees not to make any claim against the Company based on how the Company reports amounts paid under this Agreement to tax authorities or if an adverse determination is made as to the tax treatment of any amounts payable under this Agreement.

Employee agrees that all terms, compensation, and benefits of Employee's employment ended as of the Separation Date, unless otherwise set forth in this Agreement. The Parties agree that the Severance Benefits constitute sufficient consideration for this Agreement.

**Exhibit 2 Page 1**

Exhibit 2

3.  **Employee Obligations.** Employee agrees that prior to or concurrent with Employee's execution of this Agreement, Employee will resign all positions, titles, advisory roles, board of director positions, and affiliations with the Company, and any of its affiliates, partners, parent companies, or affiliates. In the event Employee fails to resign any position, Employee hereby agrees that the Company may remove Employee, without advance notice and effectively immediately, from any such position. Prior to or at the time of such resignations, Employee shall turn over to the Company all passwords, administrative access requirements, signature authority, and other Proprietary Information held by Employee necessary for the Company to maintain continuity regarding Company processes, administrative functions, and accounts. Employee further agrees that within thirty (30) days of the Effective Date, Employee will cease holding himself out as being an employee, executive, or board member of the Company, including, but not limited to, through removal of all online profile or social media profile information indicating Employee's current employment or affiliation with the Company.

4.  **Other Payments.** Other than the payments described in Paragraph 2 above, Employee agrees that no other payments, wages, bonuses, commissions, overtime, benefits, insurance benefits, severance, or other compensation are owed to Employee by the Company. If Employee was utilizing the Company's medical benefits program, Employee's benefits will terminate on August 30, 2025, unless Employee chose or chooses to elect COBRA coverage to extend those benefits. Employee represents that Employee is not aware of any facts on which a claim under the Family and Medical Leave Act, the Fair Labor Standards Act, or any state or local minimum wage, wage payment, or leave laws could be brought.

4.  **No Consideration Absent Execution of this Agreement.** Employee understands and agrees that Employee will not receive, and is not entitled to receive, the consideration specified in Paragraph 2, absent Employee's execution and non-revocation of this Agreement and compliance with its terms.

5.  **Waiver and General Release of All Claims.** In exchange for the consideration provided by the Company in this Agreement, the sufficiency of which is acknowledged by both Parties, Employee waives and releases all known and unknown claims and causes of action of any kind Employee has or may have against the Company (including its parent, affiliates, subsidiaries, divisions, holding companies, predecessors, successors, assigns, current and former owners, officers, directors, managers, partners, shareholders, board members, employees, attorneys, representatives, agents, and insurers) from the time of Employee's initial contact with the Company to and including the day Employee signs this Agreement. This wavier and general release of all claims includes, but is not limited to, all claims and causes of action related to or in any way arising from Employee's employment by the Company, and/or any other occurrence prior to the date Employee signs this Agreement. The claims and causes of action Employee is releasing and waiving include, but are not limited to, any and all claims and causes of action that the Company:

    a)  violated any type of written or unwritten contract, labor contract, agreement, understanding, policy, benefit, retirement and/or pension plan, promise, covenant of any kind, including, but not limited to, any covenant of good faith and fair dealing or any employment contract between Employee and it, and/or Company by-law, handbook provision, or policy;

    b)  discriminated against or harassed Employee on the basis of any characteristic or trait protected under any law, including, but not limited to, race, color, sex, national origin, ancestry, disability, religion, marital status, parental status, citizenship, age (including, but not limited to, claims under the Age Discrimination in Employment

2

**Exhibit 2 Page 2**

Act of 1967 (as amended)), source of income, union activities, sexual orientation, gender identity or transgender status, or entitlement to benefits, in violation of local, state, or federal laws, constitutions, regulations, ordinances, or executive orders;

c)      retaliated against Employee for engaging in any protected activities in violation of local, state, or federal laws, constitutions, regulations, ordinances, or executive orders;

d)      violated public policy or common law, including, but not limited to, claims for: personal injury; invasion of privacy; retaliatory discharge; negligent hiring, entrustment, training, retention, or supervision; wanton and willful conduct; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional or tortious interference with contract; negligence; detrimental reliance; loss of consortium to Employee's spouse or any member of Employee's family; whistle blowing; and/or promissory estoppel;

e)      violated the Washington Industrial Welfare Act (IWA), the Washington Law Against Discrimination (WLAD), the Washington leave laws, the Washington Minimum Wage Requirements and Labor Standards Act, Title 49 of the Revised Code of Washington, the Washington Equal Pay Opportunity Act (EPOA), the Washington Fair Chance Act (FCA), all as amended and including all of their respective implementing regulations and/or any other federal, state, local or foreign law (statutory, regulatory, or otherwise) that may be legally waived and released or any similar local, state, or federal laws, governing employment relationships;

f)      violated the Family Medical Leave Act, or any similar state or local law governing leave;

g)      violated the federal Fair Labor Standards Act or any similar state or local law governing the payment of wages;

h)      violated any federal, state, local or administrative statute, regulation, ordinance, rule, policy, case law, or any common law theory of any kind; and/or,

i)      is in any way obligated for any reason to pay Employee any damages, expenses, litigation costs, attorneys' fees, wages, bonuses, commissions, insurance benefits, severance pay, separation pay, termination pay, any type of payments or benefits based on Employee's separation from employment, incentive pay, disability or any other benefits, sick pay, compensatory damages, punitive damages, and/or interest.

It is the intention of the Parties not to limit this release to claims arising out of or in the scope of Employee's employment by the Company and to make this release as broad and as general as the law permits.

Excluded from this waiver and release is any claim or right which cannot be waived by law, including all claims arising after the date of this Agreement and the right to enforce this Agreement. Employee acknowledges Employee is not waiving the right to file a charge with or participate in an investigation conducted by an administrative agency, including but not limited to the Equal Employment Opportunity Commission and any similar state or local agency with jurisdiction to enforce employment-related civil

3

rights or equal rights laws. Employee also acknowledges Employee is not waiving any right to report allegations of unlawful conduct, including criminal conduct and unlawful employment practices, to federal, state, or local authorities. While this Agreement does not limit Employee's right to receive an award for information provided to the Securities and Exchange Commission, Employee understands and agrees that, to the maximum extent permitted by law, Employee is waiving Employee's right to any monetary recovery if a federal, state, or local human rights commission or any other agency or person pursues any claim on Employee's behalf. Employee acknowledges that Employee is releasing these rights and/or claims in exchange for consideration that is in addition to anything that is owed to Employee.

6. **Return of Company Property.** By signing this Agreement, Employee acknowledges and warrants that Employee has returned all Company property including, without limitation, laptop computers, personal computers, tablets, chargers, other electronic devices, cellular telephones, credit cards, identification badges, parking tags, keys to any Company facilities, and any reports, customer lists, pricing or costing information, files, memoranda, records and software, computer access codes or disks, instruction manuals, and any other physical or personal property that Employee received in connection with Employee's employment with the Company that Employee has in Employee's possession or control. Employee also agrees to provide a list of passwords or codes needed to operate or access any of the items referenced in this Paragraph. By signing this Agreement, Employee acknowledges that Employee has not retained, made, or distributed any copies, duplicates, reproductions, or excerpts of such materials.

7. **No Recovery from Any Charge or Complaint.** Employee knows of no charges or complaints filed on Employee's behalf that involve the Company. Except as prohibited by law, should any such charge or complaint be filed, Employee agrees that Employee will not accept any relief or recovery related to that charge or complaint, it shall be dismissed with prejudice upon presentation of this Agreement, and Employee shall reimburse the Company for the costs, including attorneys' fees, of defending such action. Employee may file a lawsuit challenging the enforceability of Paragraph 5 of this Agreement under the Age Discrimination in Employment Act of 1967 without violating this Paragraph.

8. **Remedy for Breach of Promises.** In the event Employee breaches this Agreement or commences, joins, or otherwise asserts an action based on events related to Employee's employment with or separation from the Company, which is precluded by this Agreement, Employee will forego the right to payment under this Agreement, will repay any money paid under this Agreement, together with interest, and pay all of the Company's reasonable attorneys' fees for defense of the claim. Employee also shall be liable to the Company for any and all other remedies available by law or in equity. This provision applies to all Paragraphs in this Agreement, including but not limited to Employee's promises made in Paragraphs 5, 6, 7, 9, 10, 11, 12, and 13 of this Agreement.

9. **Non-Disparagement.** Employee agrees not to make any statements or take any actions (whether in writing, orally, posted on social media accounts or otherwise), from the date of this Agreement forward, that (i) in any way could disparage the Company, (ii) could foreseeably harm the reputation and/or good will of the Company, (iii) could reasonably cause embarrassment to the Company; or (iv) in any way, directly or indirectly, could knowingly cause, encourage, or condone the making of such statements or the taking of such actions by anyone else. Nothing in this Paragraph shall discourage or prevent Employee from discussing or disclosing legally protected information such as allegations of sexual harassment.

The Company agrees and covenants that it will not issue any official statement or press release containing any disparaging remarks, comments, or statements concerning Employee and will instruct its employees not to make, publish, or communicate any disparaging remarks, comments, or

4

**Exhibit 2 Page 4**

statements concerning Employee. This Agreement does not, in any way, restrict the Company's ability to respond truthfully to reference requests or with truthful information regarding Employee's termination in response to inquiries from any state unemployment insurance agency, in legally-required public filings, or in any legal or administrative proceeding, or to comply with any other obligations under federal, state, or local law.

Notwithstanding anything to the contrary in this Agreement, the Parties agree that disclosure of the underlying facts of any alleged discriminatory or unfair employment practice that complies with the requirements of Section 10 (Confidentiality of this Agreement) does not constitute disparagement and does not violate the terms of this Agreement. If the Company is found to be in violation of this section, the Company may not seek enforcement of this Section or of Section 10 of this Agreement or seek damages against Employee for violating those provisions. The Company's violation of this Section does not affect the validity of the remainder of this Agreement, which shall remain in full force and effect and continue to be binding on the Parties.

This Section does not apply to sexual assault or sexual harassment claims arising after the Parties have entered into this Agreement.

10. **Confidentiality of this Agreement.** Employee represents, warrants, and confirms that Employee has not disclosed or discussed, orally or in writing, the underlying facts of any alleged discriminatory or unfair employment practice, the negotiations and discussions leading to this Agreement, the existence of this Agreement, or any of its terms or conditions with any person, organization, or entity other than Employee's immediate family members, religious advisor, medical or mental health provider, mental or behavioral health therapeutic support group, legal counsel, financial advisor, or tax preparer. Both Parties mutually agree to maintain confidentiality, except as required by law, regarding the negotiations and discussions leading to this Agreement, and the existence and substance of this Agreement, including the amount paid under this Agreement, except that Employee may disclose this Agreement to Employee's immediate family members, religious advisor, medical or mental health provider, mental or behavioral health therapeutic support group, legal counsel, financial advisor, or tax preparer. Nothing in this Agreement prohibits Employee from disclosing information about the underlying facts of any alleged discriminatory or unfair employment practice or any information about this Agreement in response to a legal process, to any state or federal government agency for any reason, or for any purpose as required by law, without any obligation to provide the Company with prior notification of the disclosure.

Disclosure of the underlying facts of any alleged discriminatory or unfair employment practice that complies with the terms of this Agreement does not constitute disparagement. If the Company violates the terms of a non-disparagement provision included in this Agreement, the Company may not seek enforcement of this Section or Section 10 (Non-Disparagement) of this Agreement or seek damages against Employee for violating those provisions.

11. **Protected Conduct and Communications.** Nothing in this Agreement prohibits Employee from communicating with a state or federal administrative agency about matters within the agency's jurisdiction or otherwise participating in any investigation or proceeding that may be conducted by such agencies. Nothing in this Agreement shall restrict or impede Employee from exercising protected rights, including those under the National Labor Relations Act, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation, valid order of a court of competent jurisdiction or an authorized government agency, or lawfully-issued subpoena, provided that such compliance does not exceed that required by the law, regulation, or order. Nothing in this Section or this Agreement prohibits or limits Employee from disclosing or discussing (either orally or

5

**Exhibit 2 Page 5**

in writing) any alleged discriminatory or unfair employment practice, nor does it prohibit Employee from making truthful statements or disclosures regarding unlawful employment practices.

12. **Cooperation with the Company.** Employee shall fully cooperate with and assist the Company with any questions that may arise regarding Employee's prior work with the Company and/or regarding any dispute in which the Company is involved and in which the Employee may have been involved. Such cooperation and assistance shall be provided at a time and manner which are mutually and reasonably agreeable to Employee and the Company, and shall include, but are not limited to, providing information, documents, and testimony, submitting to depositions, and generally cooperating to assist the Company. The Company will reimburse Employee for reasonable out-of-pocket expenses (excluding foregone wages) in connection with such assistance.

13. **Acknowledgment of Continuing Obligations.** Employee acknowledges that as part of Employee's employment with the Company, Employee signed an Employee Proprietary Information and Inventions Agreement, effective November 28, 2023, governing, among other topics, Employee's continuing obligations regarding Employee's duty to protect the Company's confidential and proprietary information (the "Employment Agreement"). Employee agrees that any violation of those continuing obligations of the Employment Agreement will be deemed a violation of this Agreement. Employee further acknowledges that this provision is of the essence in this Agreement, is supported by the consideration provided in Paragraph 2, and that the Company would suffer irreparable harm in the event of any breach of this provision.

14. **Older Workers Benefit Protection Act ("OWBPA") Provisions**. In accordance with the OWBPA, the Company advises Employee to seek the advice of legal counsel before executing the Agreement. Employee expressly represents and warrants that their execution of this Agreement is knowing and voluntary, that the OWBPA gives Employee up to twenty-one (21) calendar days to personally read and review the Agreement before executing it, although Employee may sign the Agreement sooner if desired, that this twenty-one (21) calendar day period is sufficient time to consider the contents of this Agreement, and that they fully understand the ramifications of their execution of this Agreement. Employee acknowledges that they received this Agreement on Tue August 5th, 2025 and has twenty-one (21) calendar days (until August 5th,2025) to return a signed copy of this Agreement to Malcolm Thorne by personal delivery, DocuSign, or email to mt@PromptPath.AI.com. Employee also acknowledges that under the OWBPA, Employee has the right for a period of seven (7) calendar days following Employee's execution of this Agreement to revoke Employee's acceptance of this Agreement by proper notice to the Company, and that, if revoked, the Agreement shall be of no force or effect and Employee will not be entitled to receive the Severance Benefits. Any revocation within this period must be submitted, in writing, to Malcolm Thorne via email to mt@PromptPath.AI.com. If Employee signs this Agreement and does not timely revoke it, this Agreement will become effective on the 8th calendar day after Employee signs it ("Effective Date"). Employee represents that Employee has have had the opportunity to discuss this Agreement and the requirements for a waiver under 29 U.S.C. § 626(f) with Employee's attorney, or had the opportunity to consult competent legal counsel. Employee further represents and warrants that no representation, pressure, or inducement has been made to Employee to enter into this Agreement, except as expressly set forth in this Agreement.

15. **Governing Law and Interpretation.** The Agreement shall be governed and conformed in accordance with the laws of the State of Washington without regard to its conflict of laws provision.

16. **Non-Admission of Wrongdoing.** Employee agrees that neither this Agreement nor the furnishing of any consideration for this Agreement shall be deemed or construed at any time for any purpose as an admission by the Company of any liability or unlawful conduct.

6

**Exhibit 2 Page 6**

16. **Absence of Reliance.** Employee acknowledges that in agreeing to this Agreement, Employee has not relied in any way upon representations or statements of the Company other than those representations or statements set forth in this Agreement.

17. **Amendment.** This Agreement may not be modified, altered, or changed except upon express written consent of both Parties wherein specific reference is made to this Agreement.

18. **Attorneys' Fees and Costs.** In the event it becomes necessary for either Party to bring a legal action or other proceeding to enforce any terms, covenants, or conditions of this Agreement, the prevailing Party, unless prohibited by applicable law, shall be entitled to recover its costs and expenses from the other Party, including, without limitation, reasonable attorneys' fees. Each Party is to bear their own attorneys' fees and costs with respect to reviewing and/or drafting this Agreement.

19. **Entire Agreement.** The Agreement sets forth the entire agreement between the Parties regarding the subject matter herein and supersedes any prior contracts, agreements, or understandings between the Parties, with the exception of the Employment Agreement, the Technology Assignment Agreement, the Indemnification Agreement by and between the parties dated November 28, 2023, the certain stock agreements and amendments thereto also dated November 28, 2023, and the October 2, 2023 Shareholder Agreement, all of which remain in effect to the fullest extent not inconsistent with the terms of this Agreement.

20. **Severability.** In the event any provision contained in this Agreement shall be determined to be invalid, illegal, or otherwise unenforceable in any respect for any reason, the validity, legality, and enforceability of any such provision in every other respect and the remaining provisions of this Agreement shall not, at the election of the party for whose benefit the provision exists, be in any way impaired. However, if any such invalid, illegal, or unenforceable provision may be made valid, legal, or enforceable by modifying its terms, then a court or other entity construing this Agreement may interpret or modify it to ensure its enforceability. Should the general release language be null and void, at the Company's option, this Agreement may become null and void. In that event, the Parties will execute a new or supplemental Agreement without Employee receiving any additional consideration because this Agreement was provided with the expectation that it would be fully enforceable.

21. **Defense Against Future Claims.** It is expressly understood and agreed by Employee that this instrument may be pleaded as a complete defense to, and in bar of, any action or proceeding brought, maintained or conducted by Employee against the Company in connection with or on account of any of the matters hereinabove set forth.

22. **Section 409A.** This Agreement is intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended (Section 409A), including the exceptions thereto, and shall be construed and administered in accordance with such intent. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service, as a short-term deferral, or as a settlement payment pursuant to a bona fide legal dispute shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, any installment payments provided under this Agreement shall each be treated as a separate payment. To the extent required under Section 409A, any payments to be made under this Agreement in connection with a termination of employment shall only be made if such termination constitutes a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section

7

**Exhibit 2 Page 7**

409A and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Employee on account of non-compliance with Section 409A.

23. **Consult Attorney.** Employee acknowledges that Employee has been advised, and is advised, to consult with an attorney, at Employee's own expense, prior to signing this Agreement. Employee agrees that the Company is not responsible for any of Employee's costs, expenses and/or attorney's fees in connection with any claim related to the review and signing of this Agreement.

24. **Employee Acknowledgements.** Employee acknowledges that:

   a. Employee has fully and carefully read this Agreement;
   b. Employee fully understands all of the provisions in this Agreement;
   c. Employee knowingly and voluntarily agrees to all of the terms set forth in this Agreement, and intends to be legally bound by this Agreement; and,
   d. Employee has signed this Agreement on Employee's own free will, without any duress or coercion.

25. **Section Headings.** The section headings in the Agreement are solely for convenience of reference and shall not in any way affect the interpretation of this Agreement.

26. **Non-Waiver.** Any waiver by the Company regarding Employee's breach of this Agreement shall not operate or be construed as a waiver of any subsequent breach by Employee.

27. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall construe one and the same Agreement. Signature pages may be transmitted by electronic signature service, facsimile, or via PDF. Upon delivery of the electronic signature, facsimile, or PDF, a signature shall be deemed valid and binding and shall have the same force and effect for all purposes as the original.

The Parties knowingly and voluntarily executed this Agreement as of the date set forth below:

**PROMPTPATH.AI, INC.**

_____
Kevin Root (Signature)

By: _____
(Signature)

Date: _____

Printed Name: _____

Title: _____

Date: _____

8

**Exhibit 2 Page 8**

# Exhibit 3

HAND DELIVERED VIA LEGAL MESSENGER

December 4, 2025

PromptPath.AI, Inc.
Attn: Board of Directors
c/o Registered Agent:
Incorporating Services Ltd.
3500 South DuPont Highway
Dover, DE 19901

**Shareholder Demand to Inspect Books and Records Pursuant to 8 Del. C. §220**

1.      I, Kevin Root, am a founder and current shareholder of PromptPath.AI, Inc., the Delaware corporation. Attached to this document is a copy of my Stock Purchase Agreement dated November 28, 2023.

2.      Pursuant to Section 220 of the Delaware General Corporation Law, I hereby demand the right to inspect and copy the corporation's books and records, including but not limited to:

a) Lists of current directors and officers;

b) The current capitalization table and current stock ledger;

c) Financial statements for the last three fiscal years and the current year-to-date;

d) Balance sheets, profit and loss statements, cash flow statements, and budgets for the past three years;

e) Minutes of all Board and Shareholder Meetings and signed consents for the past three years;

**Exhibit 3 Page 1**

PromptPath.AI, Inc.
Attn: Board of Directors
Shareholder Demand to Inspect Books and Records Pursuant to 8 Del. C. §220
December 4, 2025
Page 2 of 3

f) Board committee minutes and signed consents for the past three years;

g) Communications by the corporation to shareholders for the past three years;

h) Any Amendments to the Certificate of Incorporation or Bylaws that may have occurred in the past three years;

i) Records relating to financings, stock issuances, and the option pool since the formation of the company for the past three years;

j) All investor updates, management presentations, or fundraising materials provided to potential investors or existing stockholders dating from June 2025 to the present date, and

k) Current business plans, forecasts, or summaries of operations shared with the board or shareholders.

3.    The purposes for this demand are to identify the current officers and directors of the corporation, to value my holding, to assess the financial condition and governance of the corporation by its Board of Directors and any Board Committees, and to review communications from the corporation to shareholders. These purposes are related to my interests as a shareholder.

4.    Please provide access to these records within five (5) business days as required under Delaware law.

**Exhibit 3 Page 2**

PromptPath.AI, Inc.
Attn: Board of Directors
Shareholder Demand to Inspect Books and Records Pursuant to 8 Del. C. §220
December 4, 2025
Page 3 of 3

I declare under penalty of perjury under the laws of the State of Washington that the statements I have stated above are true.

Executed at Bainbridge Island, Washington, on December 4, 2025.

Kevin Root, Shareholder
4866 NE Dotson Loop
Bainbridge Island, WA, 98110-9400

STATE OF WASHINGTON        )
                           )
COUNTY OF KITSAP           )

On this __4__ day of December, 2025, I certify that I know or have satisfactory evidence that Kevin Root is the person appearing before me and making this acknowledgment is the person whose true signature appears on this document.

WITNESS my hand and official seal hereto affixed the day and year in the certificate above written.

_____
Signature

Gerald Simonsen
Print Name

**Exhibit 3 Page 3**

# Exhibit 4

| Kevin Root | | Case No.: |
|---|---|---|
| | Plaintiff/Petitioner | |
| vs. | | |
| PromptPath.AI, Inc. | | DECLARATION OF SERVICE OF |
| | Defendant/Respondent | Letter |

Received by **Alan Zielen**, on the **5th day of December, 2025 at 1:37 PM** to be served upon **PromptPath.AI, Inc. Attn: Board of Directors c/o Registered Agent: Incorporating Services Ltd. c/o Incorporating Services Ltd., Registered Agent at 3500 S Dupont Hwy, Dover, Kent County, DE 19901.**
On the **5th day of December, 2025 at 4:02 PM**, I, **Alan Zielen, SERVED PromptPath.AI, Inc. Attn: Board of Directors c/o Registered Agent: Incorporating Services Ltd. c/o Incorporating Services Ltd., Registered Agent at 3500 S Dupont Hwy, Dover, Kent County, DE 19901** in the manner indicated below:

**CORPORATE SERVICE**, by personally delivering **1** copy(ies) of the above listed documents to the named Corporation, by serving **Incorporating Services Ltd., Registered Agent**, on behalf of said Corporation.
THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY OF THIS PROCESS WAS LEFT IS AS FOLLOWS:
**I delivered the documents to Incorporating Services Ltd., Registered Agent with identity confirmed by subject saying yes when named. The individual accepted service with direct delivery. The individual appeared to be a black-haired Hispanic female contact 25-35 years of age, 5'-5'4" tall and weighing 120-140 lbs. Successfully served. Megan Gonzalez was the authorized individual.**

Service Fee Total: **$181.79**

I am over the age of eighteen, not a party to nor interested in the above entitled action, and have the proper authority in the jurisdiction in which this service was made. Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true and accurate.

NAME: _____     N/A                    12/05/2025

Alan Zielen                              Server ID #                Date

**Exhibit 4 Page 1**
Page 1 of 1

REF: **Root**

Tracking #: **0198026634**

